**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-361 (RDM)** |
| **v.** | : | |
| | : | |
| **DAVID CHRISTIAN TYNER &** | : | |
| **CHRISTIAN PETER TYNER,** | : | |
| | : | |
| **Defendants** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. David Christian Tyner and Christian Peter Tyner have pled guilty to two second degree misdemeanors, 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence David Christian Tyner on Count Three to fourteen (14) days of incarceration, and to thirty-six months of probation on Counts Four; the government further requests that this Court sentence Christian Peter Tyner to thirty-six months of probation with thirty days of home confinement on both Counts Three and Four. The government also requests that this Court impose 60 hours of community service on each defendant, and, consistent with the plea agreements, $500 restitution.

## I.      Introduction

David Tyner, a fifty-year-old software engineer, and his son, Christian Tyner, a twenty-one-year-old student,  participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College

1

vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

David Tyner and Christian Tyner each pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and (G). The government's recommendation is supported by the Tyners (1) deciding to leave their hotel room after the former president's rally and go to the Capitol, (2) bringing face coverings to obscure their identities when entering the Capitol, and (3) staying in the restricted perimeter for an extended time after leaving the Capitol. With respect to David Tyner, the government's recommendation for a period of incarceration is supported by the above aggravating factors, as well as his decision to bring his then eighteen-year-old son into a riot, verbally harassing officers in the Capitol by calling them "oath breakers," and his subsequent decision to lie to the FBI about entering the Capitol during his first interview.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of David Tyner and Christian Tyner's crimes support, respectively a sentence of fourteen days of incarceration and thirty days of home confinement, and, for both defendants, thirty-six months of probation.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECFs 33 and 35.

*David Tyner and Christian Tyner's Role in the January 6, 2021 Attack on the Capitol*

David and Christian Tyner drove to Washington, D.C, from their home in Colorado on January 4 and 5, 2021. They arrived in Washington on January 5 and stayed at the Sofitel Hotel in Lafayette Square. On the morning of January 6, 2021, they attended the "Stop the Steal" rally hosted by the former president near the Ellipse. After the former president's speech, David and Christian Tyner went back to their hotel room for snacks and to warm up from the cold. At some point after leaving the speech but prior to arriving on Capitol Grounds, the Tyners each put on a red bandana that they fashioned into a face covering.[2]

After leaving their hotel, the Tyners followed the crowd down Pennsylvania Avenue towards the Capitol and approached the Capitol from the West. David Tyner saw at least some of the scene unfolding on the West Front of the Capitol, including people climbing over the scaffolding that had been constructed on the West Front for the upcoming inauguration and smoke, as he later described it, "billowing" out from the West Front.[3] The Tyners continued walking around the north side of the building until they entered the Capitol's East Plaza.

Prior to the Tyners arriving on the East Front of the Capitol, a series of events had happened in quick succession. Between approximately 1:30 p.m. and 2:00 p.m., a large crowd amassed on

---

[2] At certain points throughout their time on Capitol Grounds, the Tyners wore these bandanas such that they completely covered the lower halves of their faces. At other times, they wore them loosely tied around their necks.

[3] This smoke was likely the result of concussive, crowd control devices that police officers on the West Front used to try to subdue the rioters and prevent their advance.

the East Front. This crowd became increasingly hostile to the United States Capitol Police (hereinafter, "USCP") and Washington, D.C., Metropolitan Police Department (hereinafter, "MPD") officers who were holding the line there against the surge of rioters. The rioters eventually broke through the line of officers at 1:57 p.m. and reached the stairs on the East Front leading to the East Rotunda Door. The police officers who had been holding the line in the East Plaza had to make a fighting retreat to the Capitol.

After the police line fell in the East Plaza, rioters overran the East Front Stairs by 2:06 p.m. At 2:25 p.m., other rioters who had already breached the building from different points opened the East Rotunda Doors from the inside, thus allowing the rioters who were still massing on the East Front Stairs to enter the building. After this initial breach of the East Rotunda Doors, USCP officers were able to push the rioters out and away from the door, which they resecured.

Fourteen minutes later, though, at 2:39 p.m., rioters on the interior of the building again opened the East Rotunda Doors and the rioters on the East Front Stairs again began pouring into the building. The officers in the East Foyer and the Rotunda beyond it were so outnumbered and overrun at the time of this second breach that they were unable to resecure the doors for a second time. With the East Rotunda Doors now open, hundreds of rioters began streaming into the building, and the Capitol was now fully breached on both its East and West Fronts.

<u>The Tyners' Entry Into the Capitol and the Rotunda</u>

At approximately 3:01p.m., David Tyner[4] entered the Capitol through the East Rotunda Door. He was dressed in blue jeans, a green overcoat with a fur-lined hood, tinted ski goggles, gray and black gloves, and a dark colored beanie. When he entered the Capitol, David Tyner pulled his red bandana up over his face so that it covered the lower half of his face.

---

[4] David Tyner is circled in red throughout.



*Figure 1 (screenshot from Gov. Ex. 1 at 07:45).*

Seconds later, Christian Tyner[5] entered the Capitol via the East Rotunda Door. Christian Tyner was dressed in faded, ripped blue jeans, a gray hoodie, a yellow-brown colored jacket, white shoes, ski goggles, and a red, white, and blue "Trump" branded beanie. As with his father, Christian Tyner wore a red bandana that covered the lower half of his face.



*Figure 2 (screenshot from Gov. Ex. 1 at 07:52)*

---

[5] Christian Tyner is circled in yellow throughout.

After entering the Capitol, the Tyners moved from the East Foyer to the Rotunda, where they joined a large crowd of rioters. The Tyners entered the Rotunda at approximately 3:02 p.m.



*Figure 3 (screenshot from Gov. Ex. 2 at 00:35)*



*Figure 3 (detail).*

While the Tyners were inside the Rotunda, as the crowd there began to swell because of the now many breached entrances, they became separated, and David Tyner began searching for Christian Tyner within the crowd in the Rotunda. During this period, David Tyner walked past rioters who were washing chemical irritant out of their eyes, while David Tyner yelled and looked

at the ground. *See* Gov. 3 at 17:50-1755;[6] *see also id.* at 18:08-18:12. Because of the overwhelming

noise in the Rotunda, David Tyner's words were inaudible on open-source video.



*Figure 4 (screenshot from Gov. Ex. 3 at 17:54)*

A short time after being separated, the Tyners reunited and remained in the Rotunda for

approximately five minutes before a group of police officers entered the area and formed a line to

begin moving the rioters from the Rotunda. The Tyners came face-to-face with the line of police

officers at approximately 3:08 p.m. Again, David Tyner's words that appeared to be directed at a

particular police officer were not captured on open-source video. At that time, other rioters in the

Rotunda were chanting, "Trump! Trump! Trump!" *See* Gov. Ex. 3 at 18:30-18:36.



*Figure 5 (screenshot from Gov. Ex. 3 at 18:32)*

---

[6] Gov. Ex. 3 is available at https://www.youtube.com/watch?v=jBRJmnvFfo8&t=1113s.

At approximately 3:09 p.m., the Tyners began moving towards the East Rotunda Doors and exited the Rotunda. As they were exiting, David Tyner pulled down his bandana, revealing his face, and Christian Tyner removed his beanie, exposing his hair. *See* Figure 6.



*Figure 6 (screenshot from Gov. Ex. 4 at 03:39)*

The Tyners moved with the crowd and exited the Capitol at approximately 3:17 p.m.

<u>The Tyners' Activities on the East Portico and North Terrace</u>

After exiting the Capitol, the Tyners remained within its restricted perimeter for a lengthy time. During this time, they milled about with other rioters in the East Portico and on the East Front Steps and watched as certain individuals, including Jacob Chansley,[7] gave speeches to the crowd. The Tyners remained in this area from approximately 3:17 p.m., when they exited the Capitol, until just after 4:30 p.m.

At around 4:30 p.m., the crowd that had gathered in the East Portico and on the East Steps began to move around the northeast corner of the building to the North Terrace. At the same time

---

[7] Chansley is one of the most notable rioters from the January 6 riot at the Capitol, as he was at the head of the mob as it first breached the Senate Wing Door, carried a spear, entered the Senate, and stood on the Senate Dais, all while wearing a distinctive outfit that included leather breeches, a buffalo horned headdress, and red, white and blue face paint. *See United States v. Jacob Chansley*, 21-CR-3 (RCL). Chansley was sentenced to forty-one months of incarceration, thirty-six months of probation, and $2,000 restitution for his conduct on January 6, 2021.

that the crowd was moving to the North Terrace, a line of MPD officers and riot-gear clad officers from Prince George's County Police Department—who had responded to the Capitol to provide assistance to the overwhelmed and outnumber MPD and USCP officers— were moving from south to north up the North Terrace to clear the rioters from it. As the officers moved, they encountered sustained, violent resistance from the rioters on the North Terrace. Some rioters threw objects at the officers, slammed bodies into the officers' shields, pushed them, used chemical agents against them, and struck the officers with fists, blunt objects, and weapons to slow their advance.

At approximately 4:34 p.m., right after the Tyners turned the corner from the East Terrace to the North Terrace, they walked into the police line that was still trying to clear the North Terrace. At that moment, other rioters around the Tyners were fighting against the efforts of the officers to clear the terrace. *See* Gov. Ex. 5 at 1:11:44-1:12:02.[8] During the Tyners' encounter with the police line, Christian Tyner was struck on the head by some unknown object.[9] As this interaction is happening, David Tyner can be seen using his body to shield Christian Tyner and then to pull him away from the police line. *Id.*

Christian Tyner's head injury began to bleed heavily. Another person in the crowd stated that they had medical training and used a bandage to wrap Christian Tyner's head. *See* Figure 8.

---

[8] Gov. Ex. 5 is available at https://vimeo.com/503397722.
[9] The government has closely studied the video that shows the Tyners' encounter with the police line at 4:34 p.m. and has been unable to determine precisely how Christian Tyner was struck or who struck him. See Gov. 5 at 1:11:44-1:12:02. The evidence shows that Christian was injured when he departed the scrum area between the police and the rioters, not earlier.



*Figure 8.*

The Tyners' Activities After the Riot

After Christian Tyner was injured at approximately 4:34 p.m., the Tyners left the Capitol Grounds and sought medical treatment at a local hospital. Christian Tyner received stitches as a result of his injury. After leaving the hospital, the Tyners spent the night at the Sofitel hotel before beginning home to Colorado the following day.

David Tyner's Pre-Arrest Interview

On May 7, 2021, after the FBI received a tip that the Tyners had participated in the riot at the United States Capitol, agents interviewed David Tyner outside his home in Highlands Ranch, Colorado. David Tyner was not in custody and therefore was not advised of his *Miranda* rights. During his interview, Tyner was shown Figure 8, above, and acknowledged that it depicted him and his son in Washington, D.C., on January 6, 2021. David Tyner stated that he and Christian drove to Washington from Colorado as part of a caravan. He described this trip to Washington as a "father-son trip." He further stated that, on the night of January 5, 2021, he observed a dispute

happening between pro-Trump protestors and anti-Trump protestors outside his hotel. He denied seeing any violence between the two groups of protestors or between the protestors and police.

David Tyner further stated that he and his son attended the former president's rally on the morning of January 6 before going back to their hotel room. David Tyner reported that, after leaving the hotel, he and Christian went towards the Capitol. David Tyner described seeing people "swarming" the building, "climbing the walls," and seeing people waving flags. He claimed that he got within twenty-five to thirty feet of the "front doors"[10] of the Capitol and that he saw smoke "billowing out." David Tyner denied that he and Christian ever entered the Capitol.

With regards to Christian Tyner's injury, David Tyner stated that they "got too close to the steps" and that's what led to the "clash with police" that caused the injury. He then stated that Christian described receiving medical treatment from someone in the crowd before going to the hospital and departing from D.C. back to Colorado the following day.

FBI agents were preparing to interview Christian Tyner when they learned that the Tyners had retained counsel. As such, Christian Tyner was not interviewed before his arrest.

<u>The Tyners' Debriefs with the FBI</u>

Pursuant to the terms of their plea agreements, both David Tyner and Christian Tyner were separately debriefed by the FBI in the presence of their attorneys.

<u>Christian Tyner's Debrief</u>

Christian Tyner stated that he first learned through Instagram about the events happening in Washington, D.C., on January 6, 2021, and then travelled to D.C. from Colorado as part of a

---

[10] In his first interview with the FBI, David Tyner did not distinguish between the doors on the East Front of the Capitol and the West Front. Based on subsequent descriptions, the government has determined that he likely saw the smoke coming from the West Front of the Capitol in the vicinity of the Lower West Terrace or Upper West Terrace.

convoy. Christian Tyner stated that he and his father brought to D.C. a bicycle helmet, a sweater goggles, a first aid kit, and a small metal bar that they intended to use to block any strikes from "Antifa." Christian Tyner stated that during the night of January 5, 2021, he and his father were awakened by a commotion outside their hotel and went down to the street to see what was happening. Christian Tyner stated that he observed pro-Trump and anti-Trump protestors yelling at each other but did not observe any physical conflicts between the two groups. Christian Tyner and his father then went back to the hotel and went to sleep.

The next morning, after attending the rally and seeing the former president speak, they went back to their hotel to eat and warm up. They then left the hotel and began following the crowd down Pennsylvania Avenue. During this walk, Christian Tyner heard people saying that Vice President Pence was not going to overturn the results of the election. Regarding the bandana that he wore, Christian Tyner stated that he and his father were not wearing them when they attended the speech but did put the bandanas on before leaving to go to the Capitol.

Christian Tyner stated that, when they arrived at the Capitol, he saw people climbing the scaffolding on the West Side of the building. They walked around to the other side of the building. Christian Tyner characterized their activities in the East Plaza as "just hanging out." Christian Tyner then stated that they then entered the Capitol through the Rotunda Doors and that, as he passed through the doors, he thought he saw a police officer holding the doors open.[11] Inside of the Rotunda, Christian Tyner remembered becoming separated from David Tyner at one point and struggling to find his father in the crowd inside the Rotunda. Christian Tyner stated that he then

---

[11] As seen in Figure 2, at the time that Christian Tyner passed through the East Rotunda Doors, there was an officer present and standing in the doors. However, as can be seen in Gov. Ex. 1, this officer was not holding the doors open for the rioters.

saw police officers entering the Rotunda and pushing the crowd out of the building. He reported that David Tyner told these officers that they were "oath breakers."

Once they left the building, Christian Tyner reported that they stood out front watching speeches. A man then ran up to the crowd on the East Steps and said that "something was happening" on the other side of the building. Christian Tyner and his father ran around the corner to the North Terrace. There, he heard someone repeatedly yelling "Hold the line!" while they stood in a large crowd. Initially, according to Christian Tyner, they were four or five rows away from a police line but then the people in front of them dissipated quickly and they found themselves face-to-face with the police. Christian Tyner stated that he suddenly felt as though his "feet weren't on the ground anymore" and then a sensation on the back of his head immediately following by his vision going black and a warmth spreading over his head. Christian stated that he remembered his father pulling him and receiving medical treatment from someone in the crowd. They then went to an ambulance that was waiting nearby and were transported to a local hospital. As they were moving to the ambulance, a man took their photograph.[12] Christian Tyner concluded his debrief with describing how he and his father were transported from the hospital back to their hotel by three people who he did not know, and how they started driving back to Colorado the following morning to arrive home on January 8, 2021.

Although he did minimize his conduct at times, Christian Tyner's account was largely consistent with the government's evidence. Throughout his debrief, Christian Tyner stated that going to the Capitol was a mistake and expressed remorse. Christian Tyner stated that he got swept up in the events of the day, but also repeatedly acknowledged his own personal responsibility for

---

[12] This is the image seen in Figure 8

entering the building. At times, while describing what happened at the Capitol and afterwards, he became emotional and remarked that he wished that he had never come to Washington.

<u>David Tyner's Debrief</u>

David Tyner's debrief was largely consistent with his son's. David Tyner stated that he first learned through a website about the events happening in Washington, D.C., on January 6, 2021. David Tyner stated that he became aware of this website following his participation in a "MAGA Drag the Interstate" event that happened in Colorado in November 2020. David Tyner stated that the backpack that he brought to the rally was packed with a bicycle helmet, goggles, a first aid kit, a sweater, and a small metal bar that was intended to block overhead strikes from "Antifa."[13] David Tyner stated that he and his son arrived in Washington on January 5 and went to their hotel. Regarding the protests that took place outside of their hotel that evening, David Tyner stated he saw pro-Trump protestors and anti-Trump protestors yelling at each other but did not see any fights other than two women getting into a minor physical altercation.

David Tyner also stated that they attended the former president's rally before returning to the hotel to eat and warm up. Regarding the bandana, David Tyner confirmed that he had not been wearing it at the speech but put it on before he went to the Capitol. David Tyner stated that he and Christian put on these bandanas because he believed there would potentially be violent resistance from counter protestors. David Tyner stated that, on the West Front, he saw smoke "billowing out" and the large crowd gathered on that side. He denied seeing any violence occurring there but decided that he and Christian would not approach the building on that side based on the size of the crowd. In the East Plaza, David Tyner stated, he and Christian watched three or four "groups" of

---

[13] David Tyner explained that had taken this metal bar from an old office chair and that he intended to put it in his sleeve, which would allow him to use his forearm to block potential overhead strikes.

14

people enter the building before deciding to go in themselves. Inside the Capitol, David Tyner recounted, he saw a lot of statues and art but soon became separated from Christian Tyner. David Tyner said that, at this time, he began to panic and believed that Christian may have fallen and was being trampled by the crowd in the Rotunda. After David Tyner located his son in the Rotunda, they saw a line of police officers forcing people from the building. David Tyner stated that he did not recall saying anything directly to the police officers.

Regarding the events on the North Terrace, David Tyner stated, they learned that "something" was happening on the other side of the building and that he and Christian ran around to the North Terrace and saw smoke coming from the North Door. They also saw a line of police officers approximately four to five rows of people away from them. However, David Tyner stated that the people in front of them quickly dissipated and they soon found themselves directly in front of the police. David Tyner further stated that, as soon as they were in front of the police, he turned around and grabbed Christian and moved to get out of the way of the police. David Tyner then said that he felt Christian's head, sensed that it was wet, and then pulled his son out of the crowd. Another person in the crowd who stated that she had medical training wrapped Christian's head and told David Tyner to get him to the hospital. David Tyner walked Christian to a group of ambulances near the Capitol and that, during this walk, someone took their photograph.[14] The ambulance took David and Christian Tyner to the hospital. The next morning, David Tyner reported, he went to a nearby drug store and bought some first aid and wound care items and then began driving back to Colorado. David Tyner characterized his participation in the January 6 riot at the United States Capitol, including his decision to go to the disturbance on the North Terrace where Christian Tyner was injured as, "Not his best decision making day."

---

[14] *See* Figure 8.

During this debrief, David Tyner's account of January 6, 2021, was largely consistent with the government's evidence of his conduct. Throughout, David Tyner stated that going to the Capitol was a mistake and expressed remorse. David Tyner acknowledged that he should not have gone into the Capitol that day and stated that he wished that he had never come to Washington or become involved with politics. Repeatedly during the course of his interview, David Tyner expressed remorse for his choice that day, at times becoming emotional about what happened that day and his conduct during the riot.

*The Charges, Arrest, and Plea Agreement*

On June 21, 2023, the United States charged David and Christian Tyner by a four count criminal complaint. When the FBI contacted the Tyners to organize a surrender in Denver, their attorneys contacted counsel for the government and requested that the Tyners be permitted to surrender themselves in Washington so that both the defendants and the government could expend fewer resources on this case. On July 20, 2023, the Tyners travelled from Florida to Washington, D.C., to surrender themselves to the FBI for arrest on the criminal complaint and had their initial appearance in the Magistrate Court for the District of Columbia that same day. They were released on their own recognizance. The Tyners, who indicated as early as their initial appearance date their desire to resolve the case short of trial, requested a single continuance in this case so that their attorneys could continue discussing a non-trial resolution with the government and review the discovery that the government had provided to them. The Tyners availed themselves of the first plea extended to them so that they could quickly resolve their case. On October 12, 2023, they were charged via four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On October 26, 2023, before there had been a single status hearing in the case, the Tyners pleaded guilty to Counts Three and Four of the Information, charging them

with a violations of 40 U.S.C. § 5104(e)(2)(D) and (G). By plea agreement, they have agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Both David and Christian Tyner now face a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, the Tyners face up to six months of imprisonment and a fine of up to $5,000 on each count. The Tyners must also pay $500 restitution under the terms of their plea. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of sentencing David Tyner to fourteen days of incarceration on Count Three and thirty-six months of probation on Count Four and Christian Tyner to thirty-six months of probation with thirty days of home confinement.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Tyners' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendant like these, the absence of

17

violent or destructive acts is not a mitigating factor. Had the Tyners engaged in such conduct, they would have faced additional criminal charges.

There are several factors in this case that weigh in favor of, in David Tyner's case, a fourteen day term of incarceration and thirty-six months of probation, and, in Christian Tyner's case, a thirty-six month period of probation with thirty days of home detention as a term of that probation. First, the Tyners went back to their hotel and then went to the Capitol, meaning that they did not get swept up in the crowd immediately after the rally and follow the crowd to the Capitol; they had an opportunity to stop and reflect, yet chose to go to the scene of the riot. Second, as they approached the restricted area around the grounds, the Tyners had ample evidence that they were entering the scene of a riot and still chose to join the mob as they overran police and breached the Capitol. Third, even after being expelled from the building, remained in the restricted area for an extended period of time. As to David Tyner specifically, he lied to the FBI during his initial interview in 2021, called the police "oath breakers" in the Rotunda, and—perhaps most importantly—brought his eighteen-year-old son to a deadly riot that struck at our seat of government and the peaceful transition of power. Accordingly, the nature and the circumstances of this offense and the need to deter future illegal conduct establish the clear need for a sentence of incarceration for David Tyner and probation with home detention for Christian Tyner.

### B. David and Christian Tyner's History and Characteristics

Neither David nor Christian Tyner have a criminal history, *see* D. Tyner PSR ¶¶ 33-34 and C. Tyner PSR ¶¶ 31-32. From the time that they were charged in this case, the Tyners have expressed a desire to quickly resolve this matter and do so with minimal exertion of resources, this is evidenced by their decision to travel to Washington to surrender themselves and to accept a non-trial resolution at their first opportunity. Both David Tyner and Christian Tyner have expressed

remorse for their conduct and acknowledged that they exercised poor judgment in travelling to Washington that day and going to the Capitol. However, while they should receive credit for their conduct in this case and expressions of remorse, the Tyners' history and characteristics still support the government's respective recommended sentences.

In David Tyner's case, his history and characteristics support fourteen days of incarceration and thirty-six months of probation with. David Tyner, a father and successful computer programmer, had more than enough information at his disposal to turn away from the scene of the riot and go the other way. This is especially pertinent considering that he had his then-eighteen-year-old son with him and was responsible for his care. David Tyner's decision to bring his son to the scene of this riot was a profound failure of judgment and is indicative of the fact that he prioritized the fact that his candidate of choice had lost an election over the safety and security of his family. That he admittedly saw smoke "billowing" out from the West Front, but still covered his face with a mask and walked through the East Rotunda Door to enter the Capitol and join the riot is further evidence of his failure to consider the consequences of his actions. David Tyner also lied to the FBI about his conduct when he was first interviewed, which is evidence of his desire to evade those consequences. Christian Tyner described his father as a "pillar of stability," C. Tyner PSR ¶ 57, but on January 6, 2021, and despite clearly being someone who should have known better, David Tyner made a series of decisions that have led to nothing but instability for himself, his family, and our democratic system.

Christian Tyner's history and characteristics support a thirty-six month term of probation with thirty days of home confinement as a term of that probation. Christian Tyner is a young man who, on January 6, 2021, was approximately two months away from his nineteenth birthday. While his youth, lack of criminal record, and clear empathy for his peers and those who are struggling,

*see* C. Tyner PSR ¶ 57, are notable, the Court should consider the fact that this promising young man deviated so quicky off-course and joined a riot that struck at the heart of one of the core tenets of our republic.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs in favor of the government's respective recommended sentences for each defendant.

First, as discussed above, David Tyner is a man of obvious intelligence who has been able to use that intelligence to earn a comfortable life for himself and his family working in the computer industry. His PSR makes it clear that he is someone who prides himself on providing and caring for his family. D. Tyner PSR ¶¶ 47-51. Yet, despite being someone who should have known better, he travelled with his then-eighteen year old son to Washington and entered the Capitol as part of a riotous mob. In doing so, David Tyner demonstrated himself to be someone who is need of specific deterrence. David Tyner is someone who should have known better than to cross the threshold into the Capitol that day. While he has expressed regret about his participation in the events of that day, cooperated in his self-surrender, and accepted responsibility, the Court should still consider the gravity of the conduct in which he—as a member of the mob— participated that day. When David Tyner entered the Capitol on January 6, 2021, he shirked his responsibility as both parent and an American citizen. For this reason, the court should sentence him to a fourteen days of incarceration and thirty-six month period of probation to make clear to him that this type of conduct is unacceptable and, in this election year, will not be tolerated.

Similarly with Christian Tyner, his history makes clear that he is a bright young man with a promising future. He, too, cooperated with his self-surrender, accepted responsibility, and has

expressed regret. However, because of his young age and the many years of potential civic engagement that lay before him, the Court should make clear to him that there is a right way and a wrong way to express political thoughts and ideologies. Joining a mob, whether accompanied by one's father or not, is not an acceptable means of political discourse, and the Court's sentence should make that clear. For this reason, the Court should sentence him to thirty-six months of probation with a thirty day period of home confinement.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence both David and Christian Tyner in a manner sufficient to deter them specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[15] This Court must sentence David and Christian Tyner based on their individual conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: their participation in the January 6 riot.

David and Christian Tyner have pleaded guilty to Counts Three and Four of the Superseding Information, charging them both with disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D), and parading, demonstrating, or picketing in a Capitol

---

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

building, in violation of 40 U.S.C. § 5104(e)(2)(G).] This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the government has selected two cases that this Court has previously sentenced in connection with the January 6, 2021, riot at the United States Capitol which the government believes are appropriate comparators to the current case

In *United States v. David Ticas*, 21-cr-601 (JDB), the defendant, like David Tyner, travelled to Washington, D.C., with his child on January 6, 2021. Ticas' child, who he also brought with him into the Capitol, was a minor, whereas Christian was a legal adult when he entered the Capitol. Like David Tyner, Ticas saw evidence of the riot going on at the building but still continued his approach to the building. Unlike David Tyner, Ticas moved extensively throughout the building, while David Tyner's activities were isolated to the Rotunda. Unlike David Tyner, Ticas expressed no remorse for his actions for the entire pendency of his case, up to and including during his sentencing. Like David Tyner, however, Ticas also had a confrontation with law enforcement officers wherein he made disparaging remarks against them. Judge Bates sentenced Ticas to fourteen days of incarceration.

In *United States v. Michael McCormick*, 21-cr-710 (TSC), the defendant, like David Tyner, observed signs of a riot unfolding outside the building, including evidence of chemical irritants in the air. Also like David Tyner, the defendant was in the Capitol for a relatively brief period time,

with McCormick being in the building for eight minutes while David Tyner was inside for approximately sixteen minutes. Unlike David Tyner, McCormick took pictures inside of the Capitol. Like David Tyner, McCormick obstructed the investigation, but McCormick did so by deleting the pictures and other evidence of his presence in the Capitol after he became aware that the FBI was investigating him, while David Tyner lied about his entering the building. Unlike David Tyner, McCormick expressed no remorse about his conduct. Judge Chutkan sentenced McCormick to fourteen days of incarceration.

In *United States v. Jeremy Harrison*, 23-cr-96 (RDM), like the Tyners, the defendant drove a substantial distance from his home in Florida to attend the "Stop the Steal" rally. Like the Tyners, Harrison watched the former president's speech at the Ellipse and then went to the Capitol. Unlike the Tyners, Harrison entered the building ten minutes after the first breach and did so through the Senate Wing Doors. Like the Tyners, Harrison was inside the building for a very short period of time, two minutes, which was approximately fourteen minutes less than the Tyners. Unlike the Tyners, Harrison was very active on social media and echoed messages on the internet calling for violence. Like the Tyners, Harrison expressed regret for his decision to enter the Capitol and acknowledged that there were signs, such as the use of chemical agents by police officers, that indicated that he should not have entered the building. Harrison minimized his conduct in his interview with the FBI by claiming that he believed he was allowed in the building, while David Tyner lied outright and said that he did not enter. David Tyner, unlike Harrison, later fully recanted his lie and acknowledged his wrongdoing. Both, however, have expressed genuine regret for their conduct that day. This Court sentenced Harrison to twenty-four months of probation and sixty days of home confinement.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[16] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[16] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both David and Christian Tyner must pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[17] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) David and Christian Tyner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence David Tyner to fourteen days of incarceration and thirty-six months of probation, sixty hours of community service, and a $500 fine and Christian Tyner thirty-six months of probation with thirty days of home confinement as a term of his probation, sixty hours of community service, and a $500 fine. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on

---

[17] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

David and Christian Tyner's liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     _s/ Sean P. McCauley_
        SEAN P. McCAULEY
        Assistant United States Attorney
        New York Bar No. 5600523
        United States Attorney's Office
        For the District of Columbia
        601 D Street, NW
        Washington, DC 20530
        Sean.McCauley@usdoj.gov